UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>            Plaintiff,<br>      v.<br>RYAN C. SQUILLANTE,<br>            Defendant. | Civil Action No. 25-CV- |

# COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendant Ryan C. Squillante ("Squillante" or "Defendant"):

## SUMMARY

1. This is an insider trading action. Between August 2022 and June 2023, Squillante used confidential information that he obtained in the course of his employment as a trader at an investment firm to trade in the securities of at least ten different publicly-traded companies.

2. Squillante's employer was consulted as a potential investor in numerous public offerings of securities. At the point of those consultations, the information that Squillante and his employer received was nonpublic and confidential and was provided so that his employer could determine whether it wished to participate in the public offerings. Squillante was obligated to protect the confidentiality of that information.

3. Instead, Squillante used the confidential nonpublic information that he received as part of his employment to place trades in his personal brokerage accounts. As a result of his conduct, Squillante reaped an unfair advantage over other investors in the public markets and earned approximately $216,965 in illegal trading profits.

4. As a result of the conduct alleged herein, Squillante violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5].

5. The Commission seeks a permanent injunction against Squillante, enjoining him from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of ill-gotten gains he received from the unlawful conduct set forth in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)], together with prejudgment interest, civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(e), and 27 of the Exchange Act [15 U.S.C §§78u(d)(1), 78u(e) and 78aa].

7. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C §78aa]. Defendant resides in the District of Connecticut. Also, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Connecticut, and were effected, directly, or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails, including the internet and the telephone.

## DEFENDANT

8. Squillante, age 40, resides in Westport, Connecticut. From May 2021 to mid-December 2023, Squillante was employed as the Head of Equity Trading at an investment firm (the "Investment Firm"). For several months during 2024, Squillante consulted as an equity trader to an asset management firm. Previously, Squillante was a registered representative of a

broker-dealer firm from 2007 to 2009.

## FACTUAL ALLEGATIONS

9. As part of Squillante's job, he evaluated potential investments in equity securities for the Investment Firm. Those investment opportunities included secondary offerings of securities by publicly-traded companies. Those secondary offerings were managed by underwriters, which are investment banks that agree to buy the securities from the companies issuing them and then to sell those shares to investors.

10. In multiple instances, Squillante received material nonpublic information about upcoming offerings because the underwriter engaged in a process known as "wall crossing" to determine whether Squillante's employer would be interested in purchasing the securities that the underwriter was selling. "Wall crossing" typically refers to the process by which an investment bank provides nonpublic and confidential information about an upcoming offering to a prospective investor after obtaining that prospective investor's agreement to keep the disclosed information confidential and to use it only to decide whether the prospective investor wishes to invest in the planned offering.

11. In the instances in which Squillante received material nonpublic information about a company's upcoming offering, or other material nonpublic information about a company, through the wall crossing process, he knew and understood that he was receiving material nonpublic information and was not permitted to trade in that company's stock until either the material nonpublic information was disclosed to the public or the information otherwise became stale, such as by the proposed offering being withdrawn by the company.

12. Squillante had a duty to keep the material nonpublic information that he learned as part of his employment confidential. Squillante had a relationship of trust and confidence

3

with the Investment Firm under which he often obtained confidential information in the course of his work and he expressed his understanding that the information was to be kept confidential and not used for his personal gain.

13. Despite Squillante's understanding that he was not permitted to trade based on the material nonpublic information he received in the course of his employment, and unbeknownst to his employer, Squillante nonetheless traded on that information in his personal brokerage accounts on at least twelve occasions.

14. Squillante knew or was reckless in not knowing that public announcements of secondary offerings of stock by public companies often cause a company's stock price to decrease. In addition, he sometimes learned other negative information about these companies during the wall crossing process that he knew, or was reckless in not knowing, was likely to cause the company's stock price to decrease once the information was publicly announced. Squillante's personal trading on the basis of material nonpublic information that he learned through his employment typically took the form of Squillante selling short the stock of the companies about which he had obtained material nonpublic information. Squillante was, in essence, predicting that each company's stock would decrease in value because he had material nonpublic information that would negatively impact the stock price.

15. As an employee of the Investment Firm, Squillante owed both the Investment Firm and the underwriters with whom he engaged in business dealings on behalf of the Investment Firm a duty to protect the confidentiality of the highly sensitive and nonpublic information he was given in order to evaluate whether the Investment Firm wished to participate in proposed securities offerings. Squillante breached that duty by trading on that information in his own accounts.

16. In at least six instances, Squillante's personal trading began within about 3 hours of the time when he obtained the negative material nonpublic information about the company whose stock he traded.

17. Examples of two instances in which Squillante traded on material nonpublic information that he obtained through the course of his employment are described below.

**Squillante's Trading in the Stock of Praxis Precision Medicines, Inc.**

18. In February 2023, Praxis Precision Medicines, Inc. ("Praxis") was a publicly-traded neuroscience company that was conducting clinical trials to support seeking approval to market certain drugs. On February 27, 2023, the underwriter for a potential secondary offering of Praxis stock emailed an employee of the Investment Firm to discuss a new potential offering. That employee responded by email at about 3:11 pm, saying that he was too busy to talk but that he would have Squillante "reach out right now. . ."

19. Approximately 11 minutes later, at 3:22 pm, Squillante emailed the underwriter, saying it was "good to speak quickly" and that he realized the underwriter did not have his email address so he was giving it to him in that email message.

20. Two minutes after emailing the underwriter, at about 3:24 pm, Squillante sold short 2,500 shares of Praxis stock in one of his personal brokerage accounts.

21. The same day, at about 3:38 pm, Squillante received an official "wall crossing" email message from the underwriter stating:

> This e-mail will confirm that you have agreed to receive confidential information about Praxis Precision Medicines, Inc. (NASDAQ: PRAX) (the "Company"), including the fact that the Company is contemplating a securities offering (the "Offering"); the terms, conditions and status of such Offering (including any information provided by [the underwriter] and any "cleansing" or similar email); and certain non-public clinical data, and you have further agreed to hold such information in confidence and not communicate this information to anyone outside of your firm (other

5

than in response to a request by any regulatory authority, court or tribunal, or as required under any law or regulation).  In addition, the receipt of this information may affect your firm's ability to conduct certain research, sales and trading activities.  . . . . As such, you acknowledge your obligation to use the information that we provide to you only for the purpose of evaluating the Offering.  You should consult your organization's own internal rules and policies regarding such matters.  You and others in your organization who receive this information will be insiders and thus subject to these restrictions until such time as the information is publicly announced (which will include the announcement of the non-public clinical data and may include announcement of the Offering) or you are cleansed by us or the Company.

22. Two minutes after receiving that wall crossing email, Squillante responded by email to the underwriter, stating "Thank you – we agree."  Squillante, his colleagues at the Investment Firm, and the staff of the underwriter then exchanged additional emails to schedule a teleconference to discuss the potential offering in more detail.  A meeting invitation, which included Squillante and his colleagues at the Investment Firm, was sent and scheduled for the following morning.

23. During that morning meeting on February 28, 2023 between the underwriter and Squillante's colleagues at the Investment Firm, the underwriter discussed both the contemplated securities offering and recent negative clinical drug trial results and the timing of a press release concerning those results.

24. Following that meeting on February 28, 2023, Squillante sold short an additional 12,094 shares of Praxis stock in one of his personal brokerage accounts.  Over the next two days, March 1 and March 2, Squillante sold short an additional 23,492 shares of Praxis stock in another of his personal brokerage accounts.  By the end of the trading day on March 2, 2023, Squillante's personal brokerage accounts were short a total of 38,086 Praxis shares.

25. On March 3, 2023, at 7:30 am, Praxis publicly disclosed its negative clinical trial results.  These results had previously been shared with Squillante's colleagues at the Investment

6

Firm via the wall crossing protocol. Specifically, Praxis announced that the trial for its most advanced drug candidate to treat nervous system tremors did not establish the primary efficacy endpoint by a statistically significant amount compared to the placebo.

26. Only minutes later, between 7:41 am and 7:49 am, Squillante purchased a total of 38,086 shares of Praxis stock to cover his short position in his two personal brokerage accounts. The market price of Praxis's stock began to drop between the public announcement of its clinical trial data and Squillante's covering purchases. Overall, in the first trading day after Praxis' public announcement, the market price of Praxis stock dropped by almost 66%, from a closing price of $2.92 per share on March 2, 2023 to a closing price of $0.9965 per share on March 3, 2023.

27. As a result of Squillante's illegal use of material nonpublic information about Praxis, he realized $46,421 in proceeds from his trading in Praxis stock between February 27 and March 3, 2023.

**Squillante's Trading in Zynex, Inc.**

28. In May 2023, Zynex, Inc. ("Zynex") was a publicly-traded company that designed, manufactured and marketed medical devices. On the morning of May 2, 2023, the underwriter for a potential transaction relating to Zynex had a conversation with Squillante to discuss that potential transaction. The potential transaction had two parts: (1) the company was considering a convertible debt securities offering, and (2) a major company shareholder was considering a secondary offering of the company's common stock owned by that shareholder.

29. The underwriter sent a follow-up email to Squillante at 12:05 pm that day, confirming their conversation and further confirming that, "in the course of such conversation you [Squillante] have received non-public and potentially material information within the

meaning of the U.S. federal securities laws" about the proposed transaction, its "timing, structure, terms and proposed use of proceeds of the proposed convertible debt offering" and that Squillante may get additional information about the transaction in the future.

30. The underwriter's email further stated:

> You acknowledge that the U.S. federal securities laws and other laws prohibit any person who has material non-public information about a company from purchasing or selling securities of that company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. You have agreed that, for so long as the confidentiality obligation remains in effect, you will not directly or indirectly engage in market transactions relating to the Company's securities and related instruments, . . . . You have further agreed that, for so long as the confidentiality obligations remain in effect, you will treat and keep all non-public information that you receive as confidential, you will not disclose any of the non-public information that you receive to any other person in your firm without the same restrictions regarding the use of the non-public information being imposed on such persons and you will use the non-public information only in connection with evaluating, analyzing and negotiating a potential investment in the Company and not for any other purpose.

31. Squillante responded to the underwriter's email 10 minutes later, at 12:15 pm, and selected a time from among those that had been proposed for a follow-up meeting with the underwriter.

32. Approximately 15 minutes later, an employee of the underwriter sent a calendar invitation to Squillante and several of his colleagues at the Investment Firm to set a meeting for 9 am the following morning, May 3, 2023. The calendar invitation also provided a link to documents that would be discussed in detail at the meeting. Squillante knew, or was reckless in not knowing, that the eventual public announcement of the transaction being discussed would likely drive Zynex's stock price down significantly.

33. At 12:05 pm on May 2, 2023, the same time that he received the underwriter's

email confirming their conversation about Zynex, Squillante began selling short shares of Zynex stock in one of his personal brokerage accounts. That afternoon, between 12:05 pm and 3:58 pm, Squillante sold short a total of 2,900 shares of Zynex.

34. On the following day, May 3, 2023, Squillante sold short an additional 10,100 shares of Zynex stock in two of his personal brokerage accounts. By 3:44 pm on May 3, 2023, Squillante's personal brokerage accounts had sold short a total of 13,000 Zynex shares.

35. On May 3, 2023, at 4:01 pm, Zynex announced that it would be making an offering of $50 million of its senior convertible notes and it also announced that its CEO was beginning an underwritten public offering of 2,000,000 shares of his Zynex stock.

36. Only minutes later, beginning at about 4:14 pm and continuing until 4:20 pm, Squillante purchased 6,500 shares of Zynex stock to cover fully his short position in one of his personal brokerage accounts. Squillante fully covered the short position in his other personal brokerage account by buying shares beginning at 4:36 pm on May 3 and continuing the next day. The market price of Zynex's stock dropped between the public announcement of securities offerings and Squillante's covering purchases. Overall, in the first trading day after Zynex's public announcement, the market price of Zynex stock dropped by about 35%, from a closing price of $14.56 per share on May 3, 2023 to a closing price of $9.37 per share on May 4, 2023.

37. As a result of Squillante's illegal use of material nonpublic information about Zynex, he realized $37,528 in proceeds from his trading in Zynex stock between May 2 and May 4, 2023.

**The Scope of Squillante's Misconduct**

38. Squillante engaged in misconduct similar to that detailed above relating to Praxis and Zynex shares with a total of at least ten different securities. The chart below lists the dates

on which Squillante engaged in illegal trading on the basis of material nonpublic information ("MNPI") that he learned, and had a duty to keep confidential as part of his employment by the Investment Firm. The chart below also lists the profits that Squillante earned from his trading in each of the ten securities.

| Offering Company | Date/Time of Wall Crossing or MNPI Awareness | Date/Time Squillante Began to Trade | Date/Time of Public Announcement of MNPI | Price Decrease of Offering Company's Stock Within One Day of Public Announcement | Squillante's Profits from Trading |
|---|---|---|---|---|---|
| Accelerate Diagnostics, Inc. | 8/15/2022 | 8/16/2022 9:35 AM | 8/17/2022 6:00 PM Secondary Offering | 27.19% | $10,575 |
| Accelerate Diagnostics, Inc. | 8/15/2022 | 8/18/2022 3:00 PM | 8/18/2022 9:30 PM Pricing of Secondary Offering | 49.40% | $1,098 |
| Mind Medicine, Inc. | 9/20/2022 8:11 AM | 9/20/2022 10:39 AM | 9/27/2022 4:17 PM Secondary Offering | 47.06% | $53,548 |
| AerSale Corp. | 11/14/2022 10:47 AM | 11/14/2022 12:58 PM | 11/15/2022 5:22 PM Secondary Offering and Share Repurchase | 12.73% | $2,748 |
| DZS, Inc. | 11/14/2022 10:47 AM | 11/14/2022 1:05 PM | 11/16/2022 4:01 PM Secondary Offering | 15.91% | $7,110 |
| Clearfield, Inc. | 12/1/2022 7:40 PM | 12/2/2022 10:55 AM | 12/6/2022 4:12 PM Secondary Offering | 6.22% | $9,445 |
| Napco Security Technologies, Inc. | 2/7/2023 | 2/8/2023 9:44 AM | 2/8/2023 4:05 PM Secondary Offering | 7.68% | $8,990 |
| Altisource Portfolio Solutions SA | 2/8/2023 10:54 PM | 2/9/2023 11:15 AM | 2/9/2023 4:28 PM Secondary Offering | 12.78% | $20,627 |
| Praxis Precision Medicines, Inc. | 2/27/2023 3:22 PM | 2/27/2023 3:24 PM | 3/3/2023 7:30 AM Negative Clinical Results provided in context of proposed Secondary Offering | 65.87% | $46,421 |
| Zynex, Inc. | 5/2/2023 12:05 PM | 5/2/2023 12:05 PM | 5/3/2023 4:01 PM | 35.65% | $37,528 |

| | | | | | |
|---|---|---|---|---|---|
| | | | Secondary Offering of Equity and Offering of Convertible Notes | | |
| ANI Pharmaceuticals, Inc. | 5/8/2023 | 5/11/2023 10:48 AM | 5/11/2023 4:01 PM Secondary Offering | 5.19% | $6,973 |
| DZS, Inc. | 5/30/2023 9:15 AM | 5/30/2023 11:12 AM | 6/1/2023 8:00 AM Announcement of Financial Restatement | 36.23% | $11,902 |
| | | | | **Total** | **$216,965** |

**CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Defendant's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

39. Paragraphs 1 through 38 above are re-alleged and incorporated by reference as if fully set forth herein.

40. By reason of the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

41. By reason of the conduct described above, Defendant violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently restrain Defendant, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R §240.10b-5] by (i) buying or selling a security of any issuer, on the basis of material nonpublic information, in breach of a fiduciary duty or other duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the information; or (ii) by communicating material nonpublic information about a security or issuer, in breach of a fiduciary duty or other duty of trust or confidence, to another person or persons for purposes of buying or selling any security;

B. Order Defendant to disgorge, with prejudgment interest, all ill-gotten gains that were obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

C. Order Defendant to pay an appropriate civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1];

D. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E. Grant such other further relief as the Court may deem just and proper.

**JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

DATED: September 5, 2025

                                              Respectfully submitted,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (Mass Bar No. 637438)
Sarah McAteer (Mass Bar No. 706403)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct)
(617) 573-8906 (McAteer direct)
(617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
McAteerSa@sec.gov (McAteer email)

Local Counsel:

Michelle L. McConaghy (ct 27157)
Assistant United States Attorney
United States Attorney's Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT  06510
Phone: (203) 821-3700
Fax: (203) 773-5373
Michelle.McConaghy@usdoj.gov